**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

SYNOPSYS, INC.,

               Plaintiff,

     v.

RISK BASED SECURITY, INC.,

            Defendant.

Civil Action No. 3:21-cv-00252

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO STAY THIS ACTION**

C. Dewayne Lonas
Stewart R. Pollock
MORAN REEVES CONN PC
1211 East Cary Street
Richmond, VA 23219

Chad A. Rutkowski
Michael S. Gordon
Lisa Bollinger Gehman
BAKER & HOSTETLER LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104

*Attorneys for Defendant Risk Based Security, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................1

FACTUAL BACKGROUND .............................................................................5

    A.    RBS and VulnDB ..............................................................5

    B.    Relationship Between the Parties ......................................7

    C.    Status of Prior Pending MA Action ..................................9

    D.    Synopsys Plans to Release RBS Trade Secrets ..............10

ARGUMENT ...................................................................................................12

    I.    The Court has Substantial Discretion
         to Stay a Declaratory Judgment Action. .............................12

    II.    A Stay of This Declaratory Action Will Prevent an Unnecessary Waste
         of Judicial Resources, Piecemeal Litigation, and Conflicting Judgments. ............15

    A.    A Stay of This Action is in the Interests of Judicial Economy
         and Avoids Inconsistent Legal Determinations on the Merits ..................16

    B.    The Absence of a Stay Imposes Significant Harm to RBS .....................20

    C.    Synopsys Will Not be Prejudiced by a Stay. .............................21

CONCLUSION .................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Training Grp. Worldwide, Inc. v. Proactive Techs. Inc.*,
No. 20-CV-646, 2020 WL 6595212 (E.D. Va. Oct. 19, 2020)........................................15, 16

*Aventis Pharma Deutschland GMBH v. Lupin Ltd.*,
403 F. Supp. 2d 484 (E.D. Va. 2005) ....................................................................................15

*Brillhart v. Excess Ins. Co.*,
316 U.S. 491 (1942)................................................................................................................13

*Clinton v. Jones*,
520 U.S. 681 (1997)................................................................................................................14

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)................................................................................................................22

*DeBord v. Great W. Cas. Co.*,
No. 6:15-CV-00119-GFVT, 2015 WL 6478926 (E.D. Ky. Oct. 27, 2015)............................13

*Essex Ins. Co. v. Championship Charters, Inc.*,
No. 3:12-CV-00068, 2013 WL 566614 (W.D.N.C. Feb. 13, 2013) ........................................14

*Exec. Consulting Grp., LLC v. Baggot*,
No. 118CV00231CMAMJW, 2018 WL 1942762 (D. Colo. Apr. 25, 2018) ..........................18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)................................................................................................................20

*Founder Starcoin, Inc. v. Launch Labs, Inc.*,
No. 18-CV-972 JLS (MDD), 2018 WL 3343790 (S.D. Cal. July 9, 2018) ............................18

*Hanover Ins. Co. v. Castle Hill Studios, LLC*,
No. 3:18-cv-00072, 2019 WL 302510 (W.D. Va. Jan. 23, 2019)............................................15

*Hopeman Bros., Inc. v. Cont'l Cas. Co.*,
307 F. Supp. 3d 433 (E.D. Va. 2018) ....................................................................................12

*J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*,
260 N.E. 2d 723 (Mass. 1970) ...............................................................................................18

*John Bean Techs. Corp. v. B GSE Grp., LLC*,
No. 1:17-CV-142-RJS-DAO, 2020 WL 4698984 (D. Utah Aug. 13, 2020) ...........................18

*Landis v. North Am. Co.*,
  299 U.S. 248 (1936)................................................................14, 15

*Lasercomb Am., Inc. v. Reynolds*,
  911 F.2d 970 (4th Cir. 1990) ...............................................22

*Malibu Media, LLC v. Doe 1*,
  No. DKC 12-1198, 2012 WL 6681990 (D. Md. Dec. 21, 2012) ...........................22

*Mitcheson v. Harris*,
  955 F.2d 235 (4th Cir. 1992) ...............................................13, 14

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
  No. 16 C 03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017) ...........................18

*PBM Nutritionals, LLC v. Dornoch Ltd.*,
  667 F. Supp. 2d 621 (E.D. Va. 2009) ...............................................15

*Riley v. Dozier Internet Law, P.C.*,
  371 Fed. App'x. 399 (4th Cir. 2010) ...............................................22

*Travelers Indem. Co. v. Plantation Oaks of Alabama, Inc.*,
  No. CIV.A. 3:08CV637-MHT, 2009 WL 902484 (M.D. Ala. Mar. 31, 2009) .....................13

*United Capitol Ins. Co. v. Kapiloff*,
  155 F.3d 488 (4th Cir. 1998) ...............................................21

*United States Fidelity & Guar. Co. v. Algernon–Blair, Inc.*,
  705 F. Supp. 1507 (M.D. Ala. 1988) ...............................................13

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
  386 F.3d 581 (4th Cir. 2004) ...............................................12, 13

*VonRosenberg v. Lawrence*,
  781 F.3d 731 (4th Cir. 2015) ...............................................22

*VRCompliance LLC v. Homeaway, Inc.*,
  715 F.3d 570 (4th Cir. 2013) ...............................................21, 22

*Williford v. Armstrong World Indus., Inc.*,
  715 F.2d 124 (4th Cir. 1983) ...............................................15

*Wilton v. Seven Falls Co.*,
  515 U.S. 277 (1995)................................................................22

**Statutes**

18 U.S.C. § 1839(3) ................................................................17

28 U.S.C. § 1446 ................................................................................................21

28 U.S.C. § 2201 ................................................................................................12

Va. Code Ann. § 59.1-336 (2011) .....................................................................18

**Other Authorities**

*Compendium of U.S. Copyright Office Practices* § 727.2 (3d ed. 2017) ...................20

https://cve.mitre.org/index.html ..........................................................................5

https://nvd.nist.gov/ ...........................................................................................5

https://vulndb.cyberriskanalytics.com/ ................................................................6

Restatement of Torts § 757, comment b ...............................................................18

Defendant, Risk Based Security Inc. ("RBS"), by and through its attorneys, in response to the Complaint filed in this action (ECF Doc. 1) hereby submits this memorandum of law in support of its motion to stay this action.

## INTRODUCTION

This action must be stayed because the core issue that plaintiff, Synopsys, Inc. ("Synopsys") seeks to place before this Court, *i.e.*, its request for a declaration that it has not misappropriated any trade secrets from RBS's proprietary vulnerability database known as "VulnDB," has been squarely before the Massachusetts Superior Court for nearly three years in an action entitled, *Risk Based Security, Inc. v. Black Duck Software, Inc.*, No. 2084CV00258-BLS2 (Mass. Super., Suffolk County) (the "Prior Pending MA Action"). Document discovery has been completed in that action and RBS currently is seeking to initiate briefing on a dispositive motion to establish that Synopsys's wholly-owned subsidiary, Black Duck Software, Inc. ("Black Duck") – the defendant in the Prior Pending MA Action – misappropriated RBS's trade secrets through its misuse of VulnDB under Massachusetts law, which governs that dispute. Indeed, RBS notified Black Duck of its intent to seek leave to move for partial summary judgment on its claim for trade secret misappropriation (Count IV in its Amended Complaint) in the Prior Pending MA Action just ***nine days before Synopsys filed the instant action***. Clearly, Synopsys raced to the federal courthouse in the Eastern District of Virginia in an attempt to make an end run around the orderly disposition of this matter in the Prior Pending MA Action.

The Massachusetts court has not yet ruled on whether RBS's proposed dispositive motion may proceed. Instead, that Court ordered the parties to meet and confer with respect to the parameters of RBS's proposed motion and to submit a joint status report to the Court on June 4, 2021 addressing each party's position with respect to the most orderly and efficient way of resolving RBS's trade secret claims – the exact same claims that Synopsys now seeks to place

before this Court. In light of the procedural posture of the Prior Pending MA Action, if this Court were to allow the instant action to proceed, it would create a serious risk of inconsistent determinations, result in litigation inefficiency, and waste judicial resources.

By way of background, Synopsys completed its acquisition of Black Duck in December 2017. At that time, Black Duck was actively engaged in stealing trade secrets from RBS under the guise of a "Reseller Agreement" that it had entered into with RBS in 2014 to license VulnDB – a proprietary security vulnerability database that is a compilation of vulnerability intelligence continually updated from proprietary sources, tools and methods. Although Synopsys has the cheek in this action to assert that RBS has no trade secrets, Black Duck, its wholly-owned subsidiary, clearly thought otherwise.

Indeed, as is being actively litigated in the Prior Pending MA Action, throughout the pendency of its five-year licensing relationship with RBS, in patent contravention of its Reseller Agreement with RBS, Black Duck took calculated, methodical steps to parse and extract proprietary source data and aggregation methodologies from VulnDB in order to create a competing product known as Black Duck Security Advisories ("BDSA"). As part of its misappropriation scheme, Black Duck created its own computer program to continuously crawl and scrape information from the very sources identified in RBS's massive database.  In so doing, Black Duck constructed a development "sandbox" in which to collect and analyze the data harvested by its scraping tools while, at the same time, fine-tuning by comparing the results with the data obtained from VulnDB. By misappropriating RBS's source list, methods, and other "know how," Black Duck was able to gradually replicate VulnDB and call it BDSA. Even with all of the technology it used to carry out its gambit, it still took Black Duck's newly formed international team of engineers over two years to complete its theft.

Black Duck's conduct is all the more shocking because it publicized its relationship with RBS as a partnership and was supposed to be an ally of RBS. It entered into a Reseller Agreement as a "partner" of RBS, promising to promote and sublicense VulnDB to Black Duck's customers. Instead, Black Duck used its privileged and confidential access to VulnDB as a Trojan horse to steal from RBS. Massachusetts law prohibits such conduct even if, as Black Duck and Synopsys erroneously argue, the sourcing and compilation of vulnerabilities contained in VulnDB does not constitute a trade secret.

Here, like Black Duck in the Prior Pending MA Action, Synopsys has attempted to justify its misappropriation on the purported ground that RBS's trade secrets consist of nothing but publicly available information and the work of others. Despite this, Black Duck refers to BDSA – the very database built from stealing VulnDB trade secrets – as its own "proprietary" vulnerability feed. *See infra*, Factual Background, Section B. Black Duck makes this hypocritical claim while acknowledging that its "proprietary" feed is, itself, based upon "data from public sources." *See id.* However, Black Duck only knew of those "public sources" because RBS provided Black Duck with its list of sources subject to a confidentiality agreement (included in the parties' Reseller Agreement). Consistent with the foregoing, while discrete pieces of public domain information standing alone do not provide a basis for trade secret protection, the massive compilation and aggregation of vulnerability information collected pursuant to a proprietary methodology and packaged by RBS into VulnDB is unique and valuable, not generally known, was subjected to reasonable measures to protect its secrecy, and provides an economic benefit – thus constituting a trade secret.

On March 30, 2021, Synopsys piled insult on injury by issuing a press release expressing its intent to "share" RBS's trade secrets, obtained through Black Duck, with an inferior, but

publicly available resource known as the Common Vulnerabilities Exposures Program ("CVE") to bolster its own standing in the technology community. Synopsys attempted to drape itself in a cloak of tech company righteousness, stating in that press release that it was merely "striv[ing] to improve the security posture of the open source community[.]" *See infra*, Factual Background, Section D. What it is really doing, however, is cynically attempting to compromise not only RBS's trade secrets, but RBS's competitive advantage in the marketplace. When RBS discovered Synopsys's plan, it sent a cease and desist letter asking Synopsys to agree to a standstill agreement to refrain from identifying vulnerabilities to CVE until the full resolution of Prior Pending MA Action. Rather than respond substantively to that letter, in presumptive coordination with Black Duck's non-response to RBS's stated intent to seek leave to move for partial summary judgment on its claim for trade secret misappropriation in the Prior Pending MA Action, Synopsys fired off this strike suit misleadingly seeking to position itself as the aggrieved party.

However, as set forth more fully below, this action must be stayed because directly at issue in the Prior Pending MA Action since August 2018 are, among other things: (i) the efforts undertaken by RBS to construct VulnDB; (ii) the trade secrets inherent in this proprietary database compilation; (iii) Black Duck's wrongful conduct in abusing its licensing relationship with RBS to misappropriate RBS's trade secrets and create a competing security vulnerability database (BDSA); and (iv) the impact of Black Duck's theft on RBS's past, existing and future business relationships. Absent a stay, the continuation of the instant action poses the substantial risks of inconsistent factual findings, inconsistent legal rulings, and an awful lot of wasted resources. While Synopsys thinks it is being clever in opening a new front in RBS's litigation against Black Duck, this current lawsuit cannot proceed without offending notions of comity, judicial economy,

and avoidance of unnecessary waste. Accordingly, it is respectfully submitted that this matter should be stayed until resolution of the Prior Pending MA Action.

## **FACTUAL BACKGROUND**

### A.   **RBS and VulnDB**

RBS is a security intelligence company based in Richmond, Virginia with substantial expertise in identifying vulnerabilities in software code. Vulnerabilities are flaws in software code that allow an "exploit" to be created, which is malware that a bad actor uses to take advantage of the flaw. RBS compiles these vulnerabilities in a proprietary database known as "VulnDB." While all software has vulnerabilities, the problem is especially pervasive in software built with source code comprised of open source software. Open source software is a popular software option in which developers make source code generally available for use in exchange for various contractual obligations such as attribution, warranty disclaimers, and, at times, cross-sharing of code.

To address these vulnerabilities, most organizations rely on Common Vulnerabilities and Exposures ("CVE") and The National Vulnerability Database ("NVD"). CVE is a catalog of known security threats operated by the Mitre Corporation, with funding from the United States Department of Homeland Security.[1] NVD is the United States government repository of standards-based vulnerability management data.[2] Once a vulnerability has been identified, CVE assigns it an identification number (a "CVE ID"), and the vulnerability identifier is then included in NVD. Although NVD may list a CVE ID, the appropriate severity scores, impact, and mitigation actions are often unavailable for long periods of time – sometimes even years. In addition to missing, late and incomplete information, today, NVD is only reporting a fraction of vulnerabilities, while

---

[1]   *See* https://cve.mitre.org/index.html.

[2]   *See* https://nvd.nist.gov/.

VulnDB comprises the details on significantly more vulnerabilities.[3] In fact, over 30% of all vulnerabilities found in VulnDB are missing from NVD, along with the vulnerability intelligence on the vulnerabilities with only a CVE ID, and it is this (ever-increasing) 30% gap that is RBS's competitive advantage and are amongst its trade secrets that Synopsys wants to share with CVE. In turn, a growing list of enterprise companies, including security solution vendors, are seeking the more comprehensive data found in VulnDB.

It is incontrovertible that VulnDB is the most comprehensive, timely database of open source code vulnerability intelligence available. RBS compiles that data into a single database that is understandable, current, reliable, and accessible. While VulnDB contains *some* publicly available vulnerability information, VulnDB includes vast amounts of information, risk scoring, metrics and classifications that are not generally known to the public. And for those vulnerabilities that are publicly known, VulnDB adds metadata, risk ratings, vulnerability classifications and solution insights. To that end, RBS protects VulnDB with encryption, multifactored authentication requirements, confidentiality obligations, and other reasonable protection measures consistent with the trade secrets contained therein. As explained below, Black Duck – and now its parent company, Synopsys – obtained access to the confidential, highly protected information subsumed within VulnDB under the guise of a Reseller Agreement with RBS. VulnDB is RBS's flagship product, and RBS earns considerable revenue by licensing access to VulnDB.

---

[3]  For example, on May 17, 2021, RBS's website, https://vulndb.cyberriskanalytics.com/, reported the total vulnerabilities of all time as 255,315 and the total vulnerabilities missing from CVE as 82,769, resulting in NVD reporting only 172,546 vulnerabilities, thus missing 32.4% of all vulnerabilities found in VulnDB.  *See* Declaration of Chad A. Rutkowski, dated May 18, 2021 ("Rutkowski Decl.") at ¶ 8, submitted herewith.

B.     **Relationship Between the Parties**

In 2014, RBS entered into a Reseller Agreement with Black Duck. *See* Declaration of C. Dewayne Lonas, dated May 18, 2021 ("Lonas Decl."), at ¶¶ 2-3, **Exhibit A** (Reseller Agreement), submitted herewith. While Black Duck was known for its 'audit' or scanning-for-compliance business at the time, it wanted to expand its compliance tool, Black Duck Hub, into the software vulnerability market. Under the Reseller Agreement, Black Duck could "embed" VulnDB into Black Duck Hub, which it then licensed to users, paying RBS a royalty for each subscription sold. *See id.*, **Exhibit A** at Sections 2.2-2.3, 3.1, Ex. A (to the Reseller Agreement). Black Duck agreed to maintain VulnDB as confidential in exchange for this licensing right. *See id.*, **Exhibit A** at Sections 10.1, 10.3. But shortly after entering the Reseller Agreement, Black Duck attempted to acquire RBS in 2016, which attempt failed.

Then, in continuing breach of its confidentiality obligations under the Reseller Agreement, Black Duck embarked on a multi-year crusade to parse and collect proprietary source data and methods from VulnDB and used this data to seed its own separate database known as BDSA in an effort to supplant VulnDB. Notably, Black Duck (and now Synopsys) refers to BDSA – the very database built from stealing VulnDB trade secrets – as its own "proprietary" vulnerability feed. *See* Rutkowski Decl., ¶ 2, **Exhibit 1** (Synopsys's "Black Duck Software Composition Analysis"). While Synopsys, like Black Duck in the Prior Pending MA Action, has attempted to justify its misappropriation on the purported ground that RBS's trade secrets consist of nothing but publicly available information and the work of others, it hypocritically acknowledges that its purported trade secret is, itself, based upon "data from public sources."  *See id.*

In or around July 2017, a dispute arose between the parties relating to Black Duck's breach of the Reseller Agreement's confidentiality provision by improper sharing of VulnDB data with

CVE.[4] *See* Lonas Decl., **Exhibit A** (Reseller Agreement) at Section 10. Then, in April 2018, RBS learned that Black Duck had misappropriated information from VulnDB and used it to create a competing database, BDSA, which Black Duck then sold to customers in place of VulnDB, accomplishing its objective of denying RBS the royalties it was owed under the Reseller Agreement. Upon discovering that breach and Black Duck's theft, RBS instituted the Prior Pending MA Action against Black Duck on August 17, 2018 in the Superior Court of Middlesex County, Massachusetts, for, among other things, trade secret misappropriation. The case was later transferred to Suffolk County, Massachusetts in an effort to expedite discovery.[5]

Synopsys, which provides software security products and consulting services, had acquired Black Duck on or about December 11, 2017. At the time of the acquisition, Black Duck purported to have a product that identifies vulnerabilities in open source software. In a press release announcing its acquisition of Black Duck, Synopsys stated "Black Duck's industry-leading products automate the process of identifying and inventorying the open source code, *detecting known security vulnerabilities* and license compliance issues. It also provides automated alerts for any *newly discovered vulnerabilities affecting the open source* code." *See* Rutkowski Decl., ¶ 3, **Exhibit 2** (November 2, 2017 Press Release) (emphasis added). It is also worth noting that during the fourth quarter of 2017, when Synopsys was conducting due diligence in connection with its acquisition of Black Duck, Synopsys also was evaluating VulnDB under the now apparent

---

[4]  After Black Duck provided sworn affidavits that it had not shared VulnDB with third parties, Black Duck and RBS eventually modified the Reseller Agreement to provide greater protections for VulnDB, including more specifically defining certain rights during the Wind-down period (*i.e*., the one year period following the termination of the Agreement) and granting RBS the right to audit Black Duck's contractual performance.

[5]  The case was transferred out of Middlesex County (No. 1881CV02383) on November 25, 2019 and transferred into Suffolk County (No. 2084CV00258) on January 28, 2020.

false pretense of entering into an agreement with RBS. Synopsys backed out of the evaluation right after the acquisition was announced.

**C.**     **Status of Prior Pending MA Action**[6]

In the Prior Pending MA Action, RBS has asserted claims against Black Duck for breach of contract; breach of the implied covenant of good faith and fair dealing; ***misappropriation of trade secrets***; ***unfair and deceptive trade practices in violation of MASS. G. L. c. 93A***; unjust enrichment; and quantum meruit. *See* Lonas Decl., ¶ 4, **Exhibit B** (Amended Complaint). In November 2018, the Massachusetts court ordered the discovery period to be expedited for not more than four months. Despite this order, RBS had to file several motions to compel discovery.[7] When Black Duck finally produced documents, it strategically designated a disproportionate number of the documents as "Attorneys Eyes Only" ("AEO"), or subject to the attorney-client privilege, in an apparent effort to hinder RBS's counsel's ability to meaningfully confer with RBS's principals regarding, *inter alia*, the abundant evidence of Black Duck's misappropriation of RBS's trade secrets. Black Duck's blunderbuss over-designation strategy also was apparently designed to slow down the litigation and tie up the parties with extensive motion practice.[8] On May 13, 2021, the Massachusetts Superior Court found that Black Duck had "improperly designated" as "AEO" approximately 60% of documents that had been submitted to the Court for review. *See* Lonas Decl., ¶ 5, **Exhibit C** (May 13, 2021 Order). The Court ordered these documents to be redesignated  as "Confidential" only. *See id.*

---

[6]   *See also* Lonas Decl., ¶ 2.

[7]   March 11, 2019 and July 8, 2019.

[8]   Motion for Three Tiered Protective Order filed on December 21, 2018; Assent to Motion to Seal filed on February 26, 2019; Motion to Compel filed on February 22, 2019; Stipulation for Enlarging Time to Respond to Motion to Compel Discovery filed on July 12, 2019; and Opposition to RBS's Motion to Compel Discovery filed July 22, 2019.

Moreover, on or about April 5, 2021, in accord with the procedural requirements of the Massachusetts Superior Court, RBS's counsel sent Black Duck's counsel a letter seeking to confer about RBS moving for partial summary judgment, *under Massachusetts law*, with respect to RBS's claim of trade secret misappropriation. *See* Lonas Decl., ¶ 6, **Exhibit D** (April 5, 2021 RBS Letter); *see also id.*, **Exhibit A** (Reseller Agreement) at Section 13.11 (providing for application of Massachusetts law). In its letter, RBS stated that Black Duck was required to maintain the confidentiality of VulnDB under the stringent confidentiality provisions of the Reseller Agreement and the evaluation agreement that preceded it. *Id.* RBS further pointed out that Black Duck's own documents produced in discovery in the Prior Pending MA Action establish that Black Duck had misappropriated the compilation of data contained within VulnDB, including, but not limited to, RBS's sources, all with the express purpose of replacing and going into competition with RBS. *Id.* Black Duck went radio silent and did not respond to RBS's April 5 letter until advising RBS's counsel that Synopsys (which Hogan Lovells also represents) had filed the instant action.

On May 5, 2021, RBS's request for leave to move for partial summary judgment on trade secret misappropriation was taken up with the Massachusetts court at a hearing in the Prior Pending MA Action. In the hearing, the Court directed the parties to meet and confer in an attempt to define the scope of trade secrets that would be subject to RBS's proposed motion, which the Court asked the parties to incorporate in a joint status report to be submitted on June 4, 2021. Clearly, Black Duck (through Synopsys) sought to make an end run around the Massachusetts court's jurisdiction over these issues by filing the instant action.

**D.   Synopsys Plans to Release RBS Trade Secrets**

Meanwhile, notwithstanding the fact that RBS's claim of trade secret misappropriation against Synopsys's subsidiary, Black Duck, is before the Court in the Prior Pending MA Action (and had been since August 2018), on March 30, 2021, Synopsys issued a press release announcing

plans to publish information to CVE that was stolen from RBS.  *See* Rutkowski Decl., ¶ 4, **Exhibit 3** (March 30, 2021 Press Release). In the press release, Synopsys inadvertently highlighted the value of the VulnDB database, stating, "In the 22 years since the CVE Program began, there has been a long-standing gap between the number of vulnerabilities discovered and those that received a CVE ID. That gap has been large enough—30% to 50%—for some critics to complain that organizations sometimes struggle to keep their software secure through the CVE database." *Id.* RBS considered this stated intent to disclose its proprietary data as part and parcel of Black Duck's continued misappropriation of RBS trade secrets, and tortious interference with RBS's current and prospective economic relationships (although, this time perpetrated by Black Duck's parent).  Both of those claims are squarely before the Massachusetts Superior Court in the Prior Pending MA Action.

As soon as RBS learned of Synopsys's plan, it sent a cease and desist letter on April 5, 2021, demanding that Synopsys refrain from releasing information from the VulnDB database. *See* Rutkowski Decl., ¶ 5, **Exhibit 4** (RBS Cease and Desist Letter). That letter also demanded that Synopsys enter into a written standstill agreement with RBS until the conclusion of the Prior Pending MA Action. Synopsys responded with a cynical feint, claiming it was unsure what RBS's trade secrets were. *See* Rutkowski Decl., ¶ 5, **Exhibit 5** (April 12, 2021 Synopsys Letter). Although Synopsys knows full well the identity of RBS's trade secrets by virtue of the long-running Prior Pending MA Action, RBS nonetheless extended the period for Synopsys to reply and commit to a written standstill agreement. *See* Rutkowski Decl., ¶ 7, **Exhibit 6** (April 13, 2021 RBS Letter). Synopsys ignored that letter and instead, on April 14, 2021, filed the instant action seeking declaratory relief as to the same trade secret misappropriation claims that are before the Massachusetts Superior Court in the Prior Pending MA Action  Most tellingly, Synopsys did not

and has not denied that the information it intends to release to CVE is the information that Black Duck culled from VulnDB.

## ARGUMENT

### I.   THE COURT HAS SUBSTANTIAL DISCRETION TO STAY A DECLARATORY JUDGMENT ACTION.

This Court has substantial discretion to stay the instant action due to the pendency of the Prior Pending MA Action – a previously filed action involving essentially the same parties as well as many of the same factual and legal issues. The identity of legal issues in both actions most notably includes the scope and extent of misappropriation of RBS's trade secrets by Synopsys's wholly-owned subsidiary, Black Duck, the very trade secrets which Synopsys has access to and now seeks to publish to CVE, and which it has asked the Court here to declare were not misappropriated.

While the Federal Declaratory Judgment Act ("FDJA") provides that a district court "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," 28 U.S.C. § 2201 *et seq.* (emphasis added), such jurisdiction is discretionary and even if a district court possesses jurisdiction, "it may nonetheless, in the exercise of its discretion, decline to entertain the action." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594 (4th Cir. 2004). *See also Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 307 F. Supp. 3d 433, 441 (E.D. Va. 2018) (noting that district courts have "unique and substantial discretion in deciding whether to declare the rights of litigants" in declaratory suits).

Federal courts can exercise jurisdiction in declaratory actions "when three essentials are met: (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (*e.g.*, federal question or diversity jurisdiction); and (3) the

court does not abuse its discretion in its exercise of jurisdiction." *Volvo*, 386 F.3d at 592 (internal quotations omitted).

However, courts routinely decline to exercise their discretionary jurisdiction where a state court proceeding, like the Prior Pending MA Action, is already pending (and has been for some time) that presents overlapping factual and legal issues. "Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942).

Notions of judicial comity between state and federal courts may also drive courts to decline exercising jurisdiction over a declaratory judgment action related to a pending state court action. "An important element in fostering that spirit of cooperation and respect must be a reluctance on the part of federal courts to entertain a declaratory action that could result in entanglement between the two court systems." *Mitcheson v. Harris*, 955 F.2d 235, 239 (4th Cir. 1992). Moreover:

> Further, proceeding with the federal action would result in a federal court and a state court ***simultaneously wrestling with overlapping questions of state law, with the likely possibility that one court would rule upon the merits before the other, potentially rendering the second court's efforts futile***. "Exercise of federal jurisdiction in such a situation risks unnecessary commitment of scarce judicial resources, multiplicative expenditures of legal services, inconsistent rulings at numerous litigation junctures, and the appearance of disregard for the state trial court's authority and expertise in violation of basic norms of federal and state comity."

*Travelers Indem. Co. v. Plantation Oaks of Alabama, Inc.*, No. CIV.A. 3:08CV637-MHT, 2009 WL 902484, at *4 (M.D. Ala. Mar. 31, 2009) (quoting *United States Fidelity & Guar. Co. v. Algernon–Blair, Inc.*, 705 F. Supp. 1507, 1514 (M.D. Ala. 1988)) (emphasis added). *See also DeBord v. Great W. Cas. Co.*, No. 6:15-CV-00119-GFVT, 2015 WL 6478926, at *5 (E.D. Ky. Oct. 27, 2015) (finding that "potential overlapping issues and inconsistent rulings in the state court

13

tort action and the declaratory judgment action" justify declining declaratory judgment jurisdiction); *Essex Ins. Co. v. Championship Charters, Inc.*, No. 3:12-CV-00068, 2013 WL 566614, at *3 (W.D.N.C. Feb. 13, 2013) ("Federal courts should not gratuitously interfere with a pending state court proceeding where the state court proceeding allows the 'opportunity for ventilation' of the issue between the parties.").

Here, the legal and factual issues in the Prior Pending MA Action substantially overlap and are intertwined with the issues in the instant action, because the trade secrets misappropriated by Black Duck, that are at issue in the Prior Pending Action, are the same trade secrets which its parent, the plaintiff here, seeks to publish to CVE, thus causing further harm to RBS. Where, as here, the state and federal action stem from the same set of operative facts, the balance is tipped in favor of declining jurisdiction, even if there is no pending state court claim. *Mitcheson*, 955 F.2d at 239. "The presence of additional defendants, additional issues, and the prior undertaking of significant discovery in an underlying state court action have been considered 'particularly salient' factors by federal trial courts in making the decision to decline jurisdiction over a declaratory judgment action…" *Essex Ins.*, 2013 WL 566614 at *3. Each of these considerations weighs in favor of a stay here as there has been nearly three years' worth of discovery, and there are additional claims and counterclaims arising out of these operative facts that are not covered by Synopsys's complaint.

Where, as here, a federal district court is faced with overlapping issues in a state court proceeding, the federal court can exercise its discretion and stay the declaratory judgment action pending the resolution of the state court matter. "The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). In exercising that discretion, a district court is instructed to "weigh competing

interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) (explaining that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket"). A court's power to grant a motion to stay comes not from the Federal Rules of Civil Procedure, but from the court's inherent power "under [its] general equity powers and in the efficient management of their dockets." *PBM Nutritionals, LLC v. Dornoch Ltd.*, 667 F. Supp. 2d 621, 631 (E.D. Va. 2009) (citing *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983)); s*ee also Aventis Pharma Deutschland GMBH v. Lupin Ltd.*, 403 F. Supp. 2d 484, 489 (E.D. Va. 2005) (noting that although not expressly provided for by the Federal Rules, a district court has inherent discretion to consider a motion to stay under its general equity powers).

Accordingly, because the Prior Pending MA Action and the instant action stem from the same set of operative facts including, *inter alia*, Black Duck's misappropriation of RBS's trade secrets, at minimum, this action should be stayed pending the outcome of the Prior Pending MA Action.

## II.    A STAY OF THIS DECLARATORY ACTION WILL PREVENT AN UNNECESSARY WASTE OF JUDICIAL RESOURCES, <u>PIECEMEAL LITIGATION, AND CONFLICTING JUDGMENTS.</u>

In deciding whether to stay a declaratory action, a district court should consider whether necessary facts will remain in dispute, considerations of practicality and wise judicial administration, and the need to prevent piecemeal litigation. *Hanover Ins. Co. v. Castle Hill Studios, LLC*, No. 3:18-cv-00072, 2019 WL 302510, at *2 (W.D. Va. Jan. 23, 2019).   "In exercising its discretionary authority to stay proceedings, a district court is guided by three factors: (1) the interests of judicial economy; (2) hardship and equity to the parties in favor of the stay; and (3) potential prejudice to parties opposed to the stay." *Advanced Training Grp. Worldwide, Inc. v. Proactive Techs. Inc.*, No. 20-CV-646, 2020 WL 6595212, at *2 (E.D. Va. Oct. 19, 2020).  A stay

is appropriate where its benefits clearly and convincingly outweigh potential harm to the parties against whom the stay is operative. *Id*.

Here, each of the three factors demonstrate that the benefits of a stay clearly and convincingly outweigh the potential harm to Synopsys, and thus, it is appropriate to stay its complaint for declaratory judgment here, pending resolution of the Prior Pending MA Action.

### A.   A Stay of This Action is in the Interests of Judicial Economy and Avoids Inconsistent Legal Determinations on the Merits.

RBS agrees that there is an actual and substantial controversy over the rights and legal relationship between the parties as it relates to VulnDB, which is why RBS filed the Prior Pending MA Action nearly three years ago. However, a judicial declaration by this Court is neither necessary nor appropriate given the significant overlap between the instant action and the Prior Pending MA Action. In fact, RBS currently is seeking leave in the Prior Pending MA Action to move for partial summary judgment on its claim for trade secret misappropriation against Black Duck because discovery in that case has reached a point where, RBS believes, a final judgment can be rendered on this issue ***under Massachusetts law***, which the parties agreed (in the Reseller Agreement) applies to any claims arising thereunder. *See* Lonas Decl., **Exhibit A** (Reseller Agreement) at Section 13.11. A final judgment in the Prior Pending MA Action will resolve the major issues contested here and thereby promote a swifter, consistent resolution of the central disputes in both actions.[9] Additionally, a simultaneous prosecution of both cases would result in the litigation of most of the key issues twice, with the potential for inconsistent results at worst and duplicative, wasteful efforts at best.

---

[9]   Black Duck has resisted RBS's proposed motion for partial summary judgment in Massachusetts at the same time that its parent, Synopsys, is seeking expedited resolution of the same issue in the Eastern District of Virginia. This underscores that the instant action is not a legitimate effort to have this issue resolved quickly but instead is a transparent effort at forum shopping.

If this Court were to grant Synopsys's request for declaratory relief in the instant action, it will be making a legal determination on the issues central to the Prior Pending MA Action, namely whether (i) the nature and scope of RBS's trade secrets, including the methodology by which RBS compiled information for VulnDB; (ii) whether Synopsys's subsidiary, Black Duck, misappropriated those trade secrets (thus paving the way for Synopsys to have access to them to provide to CVE); and (iii) whether Black Duck's, and now Synopsys's, misappropriation of VulnDB interferes with RBS's prospective contractual relationships.

The problematic overlap exists even though Synopsys is seeking a declaration under the Defend Trade Secrets Act and the Virginia Uniform Trade Secrets Act, whereas Massachusetts law governs any claim for trade secret misappropriation arising out of the parties' Reseller Agreement, *see supra*. The Defend Trade Secrets Act defines trade secrets as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
>
> - The owner thereof has taken reasonable measures to keep such information secret –and–
>
> - The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Virginia follows the Uniform Trade Secrets Act, which defines trade secrets as:

> "Trade secret" means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> 1.     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code Ann. § 59.1-336 (2011). Recently, Massachusetts also adopted the Uniform Trade Secrets Act, but previously followed the Restatement of Torts definition, which is nonetheless substantially similar: "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it.... The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 260 N.E. 2d 723, 729-31 (Mass. 1970) (quoting Restatement of Torts § 757, comment b.)

Courts that have analyzed the overlap between the various trade secret laws have found the differences to be minimal. *See, e.g.*, *John Bean Techs. Corp. v. B GSE Grp., LLC,* No. 1:17-CV-142-RJS-DAO, 2020 WL 4698984 (D. Utah Aug. 13, 2020) (finding UTSA and pre-UTSA Massachusetts law to be similar); *Founder Starcoin, Inc. v. Launch Labs, Inc.*, No. 18-CV-972 JLS (MDD), 2018 WL 3343790, at *4 (S.D. Cal. July 9, 2018) ("As other district courts in this circuit have recognized, the definitions of trade secret and misappropriation are virtually the same in both the federal DTSA, 18 U.S.C. § 1839, and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1."); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *2 (N.D. Ill. May 11, 2017) (analyzing federal Defend Trade Secrets Act claims and Illinois Trade Secrets Act claims together because the "pertinent definitions of the two acts overlap"); *Exec. Consulting Grp., LLC v. Baggot*, No. 118CV00231CMAMJW, 2018 WL 1942762, at *7 (D. Colo. Apr. 25, 2018) (misappropriation of trade secrets pursuant to the federal Defend Trade Secrets Act and the Colorado and Delaware Uniform Trade Secrets Acts are "substantially similar claims").

The Massachusetts court in the Prior Pending MA Action will be making factual findings, whether by way of dispositive briefing or submission of facts to the jury, regarding the nature and scope of RBS's trade secrets in VulnDB, and Black Duck's misappropriation thereof. And it would appear that Black Duck passed on to Synopsys the trade secrets that Black Duck so arduously extracted from VulnDB. If it is determined in the Prior Pending MA Action that Black Duck misappropriated RBS's trade secrets, Synopsys's threat to release those trade secrets to CVE is patently improper. In any event, the facts needed to determine Synopsys's rights (and any counterclaims that RBS might pursue), would be pre-empted or superseded by determinations in the Prior Pending MA Action.

The fact that Synopsys is not before the court in the Prior Pending MA Action is of no moment. For the reasons discussed above, the trade secret misappropriation perpetrated by Synopsys and Black Duck against RBS is one and the same. That is, Synopsys only came into possession of RBS's misappropriated trade secrets through its acquisition of Black Duck. Moreover, RBS's claim of tortious interference with prospective economic advantage is also related to the trade secret misappropriation claim, as Synopsys's contemplated release of RBS's trade secrets would prevent RBS from contracting with prospective customers because RBS would have little value to offer once that information became public. Finally, factual determinations will be made in the Prior Pending MA Action regarding RBS's efforts to compile and construct the VulnDB database.

Further, with respect to Synopsys's claim here for a declaration that it has not infringed any copyright that RBS has in VulnDB, while RBS has not asserted a claim for copyright infringement in the Prior Pending MA Action, the factual determinations made in that action undoubtedly will be relevant to RBS's authorship of the VulnDB database and thus RBS's

ownership of a copyright in that database. Contrary to Synopsys's basic misunderstanding of copyright law as evidenced in its complaint, it is well-recognized that copyrights protect databases. In fact, the U.S. Copyright Office recognizes three discrete forms of authorship in computer databases, any one of which can support a copyright registration:

- The selection authorship involved in choosing the material or data that is included in the database.

- The coordination authorship involved in classifying, categorizing, ordering, or grouping the material or data

- The arrangement authorship involved in determining the placement or arrangement of the material or data within the database as a whole.

*Compendium of U.S. Copyright Office Practices* § 727.2 (3d ed. 2017). For these forms of authorship to warrant protection, they must be original to the author, meaning that they must be original to the author and possess some minimal degree of creativity. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). The threshold level of creativity is very low:  it simply requires that the work "possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id*. How RBS selected, coordinated, and arranged VulnDB, and the level of creativity deployed to create VulnDB, will be addressed during discovery in the Prior Pending MA Action regarding the construction of the database for trade secret purposes.

For all of these reasons, the instant action must be stayed to avoid the risk of inconsistent determinations in this (newly commenced) action and the Prior Pending MA Action.

**B.**     **The Absence of a Stay Imposes Significant Harm to RBS.**

 Synopsys may not desire a federal forum *per se*, but it clearly wants a forum that would approach the dispute on its terms and bring a swifter resolution to the matters in controversy as Synopsys now finds itself inconvenienced by the delay tactics employed by its subsidiary, Black Duck.

This, of course, is precisely the kind of "procedural fencing" that federal case law aims to forestall. [*United Capitol Ins. Co. v.* ]*Kapiloff*, 155 F.3d 488, 494 [(4th Cir. 1998)]. Congress designed the federal removal statute, 28 U.S.C. § 1446, as the primary avenue for obtaining federal court review of claims already pending in a state court. Under the statute, a defendant in an action pending in state court may seek to remove the action only to the federal district court "for the district and division within which such action is pending." *Id*. at § 1446(a). But if the defendant could gain a federal forum in any federal district court with personal jurisdiction over the state court plaintiff simply by filing a federal action recasting the claims against it as declaratory claims, then the removal statute's comprehensive jurisdictional scheme would be supplanted with a regime of forum shopping. District courts enjoy discretion to consider a litigant's deliberate decision to forego removal as a reason to stay its federal declaratory action.

*VRCompliance LLC v. Homeaway, Inc.*, 715 F.3d 570, 575 (4th Cir. 2013).

This action clearly represents an effort by Synopsys to sprint to a convenient forum and on an expedited schedule, such that continuing this action before the resolution of the Prior Pending MA Action would effectively grant Synopsys a premature bite at the apple despite its subsidiary, Black Duck's extensive efforts to delay an outcome in the jurisdiction of its own choosing. In the absence of a stay, RBS will be forced to relitigate virtually the same issues in the instant action without the benefit of a fulsome review of the extensive discovery exchanged in the Prior Pending MA Action, further delaying a determination in the issues in controversy.

### C. Synopsys Will Not Be Prejudiced By A Stay.

Given the significant overlap in substantive issues between the instant action and the Prior Pending MA Action, a stay in this instant action, granted in the interest of judicial economy and to avoid prejudice to RBS, would not prejudice Synopsys. Tellingly, Synopsys and Black Duck are represented by the same team of attorneys at Hogan Lovells in both the Prior Pending MA Action and this action.

Additionally, Synopsys's introduction of copyright misuse as a claim for affirmative declaratory relief as well as for damages could be resolved in the Prior Pending MA Action as evidence as to the means by which VulnDB was constructed and compiled in that litigation speaks

to the copyrightability of VulnDB, *see supra* Point II.A. While the doctrine of copyright misuse "forbids the use of a copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office," the Fourth Circuit has only recognized the doctrine as an affirmative defense. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977-79 (4th Cir. 1990) ("We are of the view, however, that since copyright and patent law serve parallel public interests, a 'misuse' defense should apply to infringement actions brought to vindicate either right"). Notably, while there is a split of authority on the question of whether a declaratory judgment action for misuse of copyright is cognizable at all, courts have generally agreed that "copyright misuse does not support a claim for damages." *Malibu Media, LLC v. Doe 1*, No. DKC 12-1198, 2012 WL 6681990, at *2 (D. Md. Dec. 21, 2012).[10]

By issuing a stay, the Court will by no means "thwart … access to a federal forum for resolution of federal claims or additional claims that properly invoke the [district court's] jurisdiction." *VRCompliance*, 715 F.3d at 575. The Supreme Court has counseled this exact course in cases like the instant one, and a stay is preferred. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 n.2 (1995) ("[W]here the basis for declining to proceed is the pendency of a state proceeding, a stay will often be the preferable course, because it assures that the federal action can proceed without risk of a time bar if the state case, for any reason, fails to resolve the matter in controversy."). In the unlikely event the Massachusetts court does not resolve the copyright

---

[10] Synopsys may have styled its copyright misuse claim as an affirmative cause of action in the hopes that it can characterize its claim as a mixed declaratory and affirmative lawsuit, thus triggering the "extraordinary circumstance" requirements of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Whatever Synopsys may call it, this action is for declaratory judgment only, and its attempt at "the perfunctory inclusion of nondeclaratory requests for relief does not suffice to remove a plaintiff from the ambit of the *Brillhart/Wilton* rule." *VonRosenberg v. Lawrence*, 781 F.3d 731, 736 n. 3 (4th Cir. 2015), as amended (Apr. 17, 2015), citing *Riley v. Dozier Internet Law, P.C.*, 371 Fed. App'x. 399 (4th Cir. 2010).

misuse claim in the Prior Pending MA Action, then, in such instance, this Court can proceed with

a resolution on the claim for declaratory relief for copyright misuse with no prejudice to Synopsys.

## **CONCLUSION**

For the foregoing reasons, RBS respectfully requests that this Court grant its Motion to

Stay this Action pending resolution of the Prior Pending MA Action.


Dated: May 18, 2021                            Respectfully submitted,

                                               */s/  C. Dewayne Lonas*
                                               C. Dewayne Lonas (VA Bar No. 44298)
                                               Stewart R. Pollock (VA Bar No. 92466)
                                               MORAN REEVES CONN PC
                                               1211 East Cary Street
                                               Richmond, VA 23219
                                               Tel: (804) 864-4820
                                               Fax: (804) 421-6251
                                               dlonas@moranreevesconn.com
                                               spollock@moranreevesconn.com

                                               Chad A. Rutkowski (*PHV forthcoming*)
                                               Michael S. Gordon (*PHV forthcoming*)
                                               Lisa Bollinger Gehman (*PHV forthcoming*)
                                               BAKER & HOSTETLER LLP
                                               2929 Arch Street
                                               Cira Centre, 12th Floor
                                               Philadelphia, PA 19104
                                               Tel: (215) 568-3100
                                               Fax: (215) 568-3439
                                               crutkowski@bakerlaw.com
                                               mgordon@bakerlaw.com
                                               lgehman@bakerlaw.com

                                               *Attorneys for Defendant Risk Based Security, Inc.*